[Civ. No. 1604. Fifth Dist. June 16, 1972.]

CITY OF FRESNO, Plaintiff and Appellant, v.
GEORGE H. CLOUD et al., Defendants and Respondents.

**COUNSEL**

Spencer Thomas, Jr., City Attorney, Alan D. Davidson, Assistant City Attorney, A. Grant Macomber, Senior Deputy City Attorney, James A. McKelvey and Norton O. Nishioka, Deputy City Attorneys, for Plaintiff and Appellant.

Lerrigo, Thuesen & Thompson and Maurice E. Smith for Defendants and Respondents.

**OPINION**

**GARGANO, J.**—This litigation concerns two adjoining and separately owned 10-acre parcels of land located within the City of Fresno near the intersection of East Gettysburg Avenue and North First Street. The intersecting city streets are included in Fresno's master plan of streets and highways. The first parcel, hereafter referred to as Parcel 1, is owned by George Cloud and fronts on East Gettysburg Avenue to the north and on North First Street to the west. The second parcel, hereafter referred to as Parcel 2, is owned by Valentine Cloud and fronts on North First Street to the west.

The two parcels are located in an R-A (residential-agricultural) zone as established by the city's comprehensive land use ordinance; an R-A zone is an area in which only residential, agricultural and similar limited land uses are permitted until such time as the need for more extensive land development warrants a change in the zone; and, it is the city's position that if it is determined that such a change in zoning of property fronting on a street shown on the master plan of streets and highways could result in an increase in vehicular traffic generated by the use of the property, the city council, before approving the change, may require street dedications necessary to conform the street to the master plan.[1]

In 1968, the City of Fresno, to widen the two city streets, instituted this action to condemn a 40-foot strip from the frontage of Parcel 1 on Gettysburg Avenue and a 40-foot frontage strip from the frontages of Parcels 1 and 2 on North First Street; a prescriptive easement was located within the strips taken by the city, and because of this easement, the court, for all practical purposes, determined that only a 20-foot frontage was

---

[1]This point will be discussed in greater detail later in the opinion.

actually taken from Parcel 1 along East Gettysburg Avenue and a 26-foot frontage from Parcels 1 and 2 along North First Street.[2] The court also found that the proposed improvement did not bring the streets to their full master plan widths and that an additional 10-foot strip from the frontage of Parcel 1 on East Gettysburg and an additional 10-foot strip from the frontages of Parcels 1 and 2 on North First Street would be required in the future to bring the streets to their full widths.[3]

After issue was joined on the complaint, defendants waived severance damages, and the cause proceeded to trial on the value of the property taken. James H. Hopper, a private appraiser, appointed by the court, testified for defendants; Charles Briggs, the Assistant Property Management Agent of the City of Fresno, testified for the city.

In arriving at the value of the property taken, Mr. Hopper assumed that the R-A zone, in which the main parcels were located, was a "holding" zone and that there was a reasonable probability that a more favorable zoning change would be made in the near future. On the basis of this assumption, Hopper visualized three different zones of value for Parcel 1: a 176′ x 160.3′ service station site on the northwest corner having a value of $70,000 or $2.50 per square foot, a "wraparound" zone for professional offices around the service station with a 150-foot frontage on Gettysburg and a 150-foot frontage on North First having a value of $1 per square foot, and a multiple residential unit area for the remaining 7.03 acres having a value of $13,500 per acre. The court-appointed appraiser then allowed $2.50 per square foot for the strip taken from the service station site, $1 a foot for the strip taken from the professional offices site, and $13,500 per acre for the strip taken from the remaining area; he fixed the value of the "take" from Parcel 1 at $23,334.[4]

Mr. Hopper concluded that the highest and best use for Parcel 2 was multiple residential and that it had a value of $13,500 per acre. He fixed the value of the frontage strip taken from this parcel at $5,306.50.

[2] The court awarded the sum of $1 for the land taken within the prescriptive easements.

[3] The city attorney asserts that the proposed improvement will bring East Gettysburg to its full planned width, and he concedes that the court's error was inadvertently induced by the city.

[4] It was Hopper's opinion that a 150′ x 150′ site was adequate for a service station and that the value of the service station site in its "after" condition is the same as it was in its "before" condition, $70,000. It is for this reason that he allowed no severance damages as a result of the "take." See Appendix, Items 1 and 2, for Hopper's plot-plan of potential development and before and after appraisal.

Charles Briggs agreed with Hopper's opinion that the highest and best use for the northwest corner of Parcel 1 was a service station site with a "wraparound" zone for professional offices; he visualized a planned unit development area for the remaining acreage. The city appraiser also agreed with Hopper's opinion that the highest and best use for Parcel 2 was multiple residential. He assumed, however, that the parcels could not be used for any of these purposes without a change in the existing zoning, and that before the city council would have approved the change, it would have required street dedications needed to conform the widths of Gettysburg Avenue and North First Street to the master plan of streets and highways. He also assumed that before building permits for the construction of a gas station and professional office buildings would have been issued, street dedications would have been required under subsection (c) of section 11-208 of the city's Municipal Code.[5] Briggs then concluded that the frontage strips taken from Parcels 1 and 2 could never be used for any purpose other than residential-agricultural, that residential-agricultural land had a value of $5,300 an acre and that the value of the "takes" should be calculated accordingly.

The trial judge accepted Hopper's opinion of the highest and best uses for Parcel 1. He also accepted the court-appointed appraiser's opinion that the service station site had a value of $70,000, the "wraparound" zone a value of $67,500, and the remaining acreage a value of $13,500 an acre. Finally, he found that the land could not be used for these purposes without a zoning change and that the change would not be made by the city council without street dedications. But the judge restricted the probable dedications to the 10-foot frontage strips which he determined would still be needed by the city to bring the two streets to their full planned widths, after the present improvement is completed. For example, the judge decided that an area encompassing 150′ x 150′, or 22,500 square feet, was suitable for a service station site and had a value of $70,-000; to this usable site he added an additional 10-foot strip to the north and an additional 10-foot strip to the west, increasing the area to 25,600 square feet; the judge apparently theorized that a buyer would want 160′ x 160′ so that he could make the dedications needed to get the city to change the zoning regulations for the property. The court, then, divided the $70,000 potential purchase price by 25,600 square feet, determined that the site was worth $2.73 per square foot, and compensated the condemnee at that rate for the strip taken from the theoretical area. Using essentially similar reasoning, the court determined that the value of the

---

[5] Under subsection (c) of section 11-208 of the city's Municipal Code, street dedications may be required in connection with the issuing of building permits.

professional offices zone was 96 cents a foot instead of $1 per foot and compensated the defendant, George Cloud, at that rate for the property taken from that zone. For the strip taken from the remaining acreage, the judge compensated the defendant at the rate of $13,500 an acre. He awarded a total of $31,030.30 for the property taken from Parcel 1.

The court agreed with the opinion of both appraisers that the highest and best use of Parcel 2 was multiple residential, with a value of $13,500 per acre. The court took into consideration the future 10-foot street dedication which would be required to secure the necessary change in zone to enable the landowner to use the property for multiple residential and compensated the condemnee at the rate of $13,500; he awarded $5,307.50 for the strip taken.

The city has appealed, raising two basic valuation principles.

One of the principles is articulated in *People* ex rel. *Dept. Pub. Wks.* v. *Investors Diversified Services, Inc.,* 262 Cal.App.2d 367 [68 Cal.Rptr. 663]. In that case the court was directly concerned with the appraisal of land affected by zoning regulations which restricted the land's uses and which depressed the market value by limiting the land's availability.[6] It held that the appraisers could take into consideration the reasonable probability of more favorable zoning changes in the near future, so long as they also considered the burdens of the probable changes. The court at page 376 of the opinion stated: "The property owner here wants the court to value its property as though the benefits of a zone change could be had without the burdens. Here again the total effect of the local zoning laws must be considered. If an appraiser finds that by reason of such a law the land probably will never be available for residential use, he should take that into consideration in forming his opinion of value."

The other is found in *City of Los Angeles* v. *Allen,* 1 Cal.2d 572 [36 P.2d 611]. There the City of Los Angeles, to widen Santa Monica Boulevard, condemned a frontage strip from a parcel of land that fronted on the boulevard. The main parcel was under one ownership, contained 38.6 acres and had a maximum depth of 2,000 feet; to a depth of 107 feet, the land had a commercial value of $1.64 per square foot; the rear portion of the property was valued at 25 cents per square foot. The trial judge used the weighted average of the two zones of value and compensated defendant at the rate of 32 cents a square foot. On appeal, the condemnee contended that the strip taken was frontage and that he should have been

[6]See *Long Beach City H. S. Dist.* v. *Stewart,* 30 Cal.2d 763 [185 P.2d 585, 173 A.L.R. 249].

allowed the commercial value. The Supreme Court disagreed. It reasoned that if to widen a public highway, a strip of land is taken from a larger parcel under one ownership and if it is clear that the main parcel has more than one theoretical zone of value, not because of any unique characteristic in the land itself, but rather because of the proximity of the theoretical zones to the public highway or similar factors affecting property values, and if it is also clear that the same zones may be immediately re-established after the "take," the owner is unjustly enriched if he is compensated on the basis of the highest zone of value; under these circumstances, the strip must be treated as an integral part of the whole and not as a separate piece of property having an independent value.

We consider first the *Investors Diversified Services* rule.

During the trial the city offered a resolution of the city council, defining the city's policy in relation to zoning changes for property fronting on streets shown on the city's master plan of streets and highways. According to this resolution, if it is determined that the change in zoning could result in an increase in vehicular traffic generated by the use of the property, the council, before approving the change, may require street dedications necessary to conform the street to the master plan.[7] The city also called George A. Kerber, the assistant planning director, to the stand to testify. Mr. Kerber was familiar with the city's zoning regulations and procedures, the city's zoning practices and policies and the conditions under which zoning changes were approved. The city offered to prove, through the council's resolution and the witness' testimony, that if an application for a zoning change for Parcels 1 and 2 had been made prior to the "take," there would have been a high probability that the change would not have been allowed and that building permits would not have been issued without the street dedications. Defendants objected on the grounds that the proffered evidence was irrelevant, raised collateral issues, and was violative of section 813 of the Evidence Code; the objection was sustained. The city argues that the trial court unduly curtailed its presentation of relevant evidence.

There is merit to the city's argument. Parcels 1 and 2 are located in a restricted land use zone, and the appraisers in arriving at their respective opinions on the value of the frontage strips taken, assumed that there was a reasonable probability that more favorable zoning changes would be made in the near future. Consequently, Charles Briggs, in line with the *Investors Diversified Services* rule, ascertained that there was a high

---

[7]See Appendix, Items 3 and 4, for the city council's resolution reaffirming the city's zoning policy.

probability that street dedications would be required before the zoning changes would be approved and took into consideration the effect this probable burden had on the value of the property taken. On the other hand, James Hopper completely overlooked the probable dedication requirement; he said he was not familiar with the city's ordinances or policies regarding street dedications as a condition to the approval of zoning changes and that he made no inquiries in this respect. The council's resolution would have shown that the city had adopted a firm policy on approving zoning changes for property fronting on streets shown on the master plan of streets and highways. Mr. Kerber could have testified to the city's actual practices and procedures with respect to this policy; he also could have expressed a professional opinion on the extent that a service station and office buildings would have increased the traffic generated by these uses. The proffered evidence would have given the trial judge the specific information he needed to consider properly the street dedication issue and was admissible to discredit Hopper's appraisal and to buttress the opinion of the city's own appraiser.

It is true that Evidence Code section 813 provides that the value of property condemned by a public agency may be shown only by the opinions of qualified expert witnesses and the owner of the property, but the section also declares that nothing therein "prohibits . . . the admission of any other admissible evidence . . . for the limited purpose of enabling the court, jury, or referee to understand and weigh the testimony given" by the experts. It would be intolerable for an appellate court to hold that a party to an eminent domain proceeding could not prove, through the use of competent and independent evidence, that an adverse appraisal was based on an erroneous premise. It is also true that a trial judge has wide discretion to reject evidence which raises collateral issues, but the discretion is not without limitation; it must be judicially exercised. The street dedication probability went to the very core of Briggs' appraisal, and the court's refusal to hear the city's supportive evidence was an abuse of discretion.

While it is clear that the trial judge erred in rejecting the city's evidence, the extent to which the error was prejudicial is not clear. Even though the judge declined to admit into evidence the counsel's resolution and Mr. Kerber's testimony, he found that street dedications would be required before zoning changes would be made for Parcels 1 and 2. Nevertheless, we reverse the judgment. The court restricted the probable street dedications to the 10-foot frontage strips the court assumed the city would still need to bring its two city streets to their full widths after the present improvement is completed. It is conceivable that if the trial judge had per-

mitted the city to present the proffered evidence, he would have concluded that the frontage strips the city was taking were also within the perimeter of the required dedications. It is also conceivable that then the judge would have held that it was highly probable that the property taken could never be used for any purpose other than residential-agricultural and would have valued it accordingly.

We consider next the city's contention that even if the trial judge properly applied the valuation principle announced in the *Investors Diversified Services* case, he committed prejudicial error when he ignored the "slide back" theory adopted by the Supreme Court in *City of Los Angeles* v. *Allen, supra,* 1 Cal.2d 572; the judge declared that subsequent appellate court decisions have eroded the *Allen* theory to the point of extinction. In the case at bench, as in *Allen,* the city condemned frontage strips from Parcel 1 which were not independently usable; as in *Allen,* prior to the "take," the main parcel had more than one theoretical zone of value primarily because of the proximity of the zones to the streets and in this case, also as in *Allen,* it is undisputed that the same zones of value could be re-established immediately after the "take."

The cases following *Allen* have considered the Supreme Court's "slide back" theory in relation to distinguishable factual situations and have not repudiated the theory nor have they cast doubt on its validity. They merely have narrowed the *Allen* formula to cases where the part taken from the larger parcel is not independently usable and where it is certain that the landowner will be placed in a better financial position than he was prior to the "take," unless the property taken is valued as part of the whole.

In *People* ex rel. *Dept. Pub. Wks.* v. *Silveira,* 236 Cal.App.2d 604 [46 Cal.Rptr. 260], the "take" was independently usable frontage property; it varied in depth from 30 feet at one end to 850 feet at the other. In addition, it was impossible to restore the pre-existing zones of value on the remaining parcel; the state had also acquired all highway access rights to that parcel. Nevertheless, the condemner argued that the property taken had to be valued as an integral part of the whole. The court refused to carry the *Allen* rule to the extremes advocated by the state and at page 618 of the opinion had this to say: "The result in *Allen* was just and proper under the particular facts of that case. But *Allen* does not stand for the proposition, as plaintiff here asserts, that where the property sought to be condemned is a part of a larger parcel, it must in all instances be valued as a part of the whole, despite the fact that it may have a greater value as a separate and distinct piece of property."

In *People* ex rel. *Dept. Pub. Wks.* v. *Corporation etc. of Latter-Day Saints,* 13 Cal.App.3d 371, 379 [91 Cal.Rptr. 532], the state condemned

frontage property which was independently usable. The court said: "The distinction between *Allen* and *Silveira,* which we draw here, reconciles the result of the two cases upon the basis of decision used in each. . . . Where the property taken is not of a size and shape which renders it independently usable, it cannot be valued on the basis of the amount that a willing buyer would pay a willing seller for the land taken, for by definition there could not be a willing buyer and seller of unusable land. The property must be valued as a part of a larger whole. In that situation, says *Allen,* the whole of which the condemned property is a part cannot arbitrarily be separated into zones of value *where the possibility of those zones is* unaffected by the taking." (Italics ours.)

The cases of *L.A. County Flood etc. Dist.* v. *McNulty,* 59 Cal.2d 333 [29 Cal.Rptr. 13, 379 P.2d 493], and *People* ex rel. *Dept. Pub. Wks.* v. *Princess Park Estates, Inc.,* 270 Cal.App.2d 876 [76 Cal.Rptr. 120], upon which the trial judge also relied, are distinguishable. Those cases hold logically that if property taken from a larger parcel under one ownership has a value different from the remainder under a "qualitive point of view," the two units cannot be averaged either to increase or decrease the value of the "take." For example, assume that a large parcel of property under one ownership is usable in part for a subdivision and that the remainder is hilly, rocky and otherwise unsuitable for subdivision purposes. If the state condemns the part suitable for a subdivision, it cannot average the two units in order to lower the value of the property taken. Conversely, if the state condemns the hilly, rocky portion, the landowner cannot avail himself of the "average unit" method of valuation to increase the value of the property taken.

We hold that the "slide back" theory of *Allen* is applicable to the property condemned from Parcel 1. In fact, as to Parcel 1, this case presents another classic example of the unjust enrichment which would result if the *Allen* theory of valuation were totally ignored. Mr. Hopper was of the opinion that the value of the service station site in its "before" condition was $70,000; he said that the value of the site in its "after" condition, although reduced in area, was still $70,000. Hopper appraised the value of the "wraparound" zone at $67,500 or $1 a foot; he stated that the same square footage was re-established immediately after the "take." The court-appointed appraiser not only admitted that Parcel 1 had essentially the same zones of value after the "take," but his appraisal indicates that the zones will be substantially benefited by the widening of the streets.[8]

---

[8]Although this factor cannot be considered in determining the value of the property taken, it points emphatically to the unjust enrichment which will result if the *Allen* theory is ignored in this case.

■ We further hold that if upon retrial of the valuation issue, the court finds that the strips taken from Parcels 1 and 2 are a part of the very frontage that the landowners would have had to dedicate to the city in order to secure the zoning changes needed to develop the remaining parcels to their highest and best uses, the court must not value the property taken on the basis of those highest and best uses; it must determine instead the value of the frontage strips taken on the basis of the highest and best uses permitted by the existing zoning, because this land could never be used for any other purpose. If the land taken is so valued, and if the landowners do not develop the remaining parcels beyond their presently permitted R-A zoning uses, the owners will have been paid exactly what the frontage strips are worth. If the remaining parcels are developed to the higher uses allowed by the contemplated zoning changes defendants will have been paid for land that they would have had to dedicate gratuitously to the city in order to gain the higher zoning advantages.

■ In reversing the judgment, we are not unmindful of the proposition that a landowner whose property is taken for a public purpose is entitled to "just compensation"; however, the constitutional requirement for the payment of "just compensation" is not only for the benefit of the landowner, but also for the benefit of the public. (*People* ex rel. *Dept. of Public Works* v. *Pera,* 190 Cal.App.2d 497, 499 [12 Cal.Rptr. 129].) A landowner is not entitled to be placed in a better position financially than he was before the condemnation; neither is the state required to pay more than land is worth merely because of some theoretical, intangible concept. We cannot ignore rules of evaluation which harmonize with the constitutional requirement of "just compensation" and which prevent landowners from receiving windfalls at public expense.

The judgment is reversed with directions to the trial court, on the basis of evidence previously presented and such additional evidence as may be presented by the parties, to redetermine the value of the frontage strips taken from Parcels 1 and 2 according to the views expressed herein. In all other respects the judgment is affirmed. Respondents to recover their costs on appeal.

Stone, P. J., and Brown (G. A.), J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 23, 1972.

## APPENDIX

*Item 1*

PARCEL 1

Net Area 9.35 Ac
S. S. Site
 176' x 160.3' = .65 Ac
Professional Offices=1.67 Ac
Multi.Fam.Res. = 7.03 Ac
 9.35 Ac

TAKING
S. S. Site 5,713 ⌀
Prof. Off. 5,445 ⌀
Mult. Fam. .267 Ac

REMAINDER
S. S. Site 22,500 ⌀
Prof. Off. 67,500 ⌀
Mult. Fam. 6.763 Ac.

PARCEL 2

Net Area 9.79 Ac
Multiple Fam. 9.79 Ac

TAKING
Multiple Fam. .393 Ac

REMAINDER
Multiple Fam. 9.397 Ac

PILOT PLAN — OF POTENTIAL DEVELOPMENT
Cloud Property
Scale 1″ = 200′

*Item 2*

PARCEL 1 AND 1A

BEFORE AND AFTER APPRAISAL

Parcel 1 (Including Prescriptive Easement & Parcel 1A Underlying Fee — Wolters)

| | | |
|---|---|---|
| Value of Whole Before Taking | | $238,002.00 |
| Value of the Taking | | |
| Service Station Site | | |
| 5,713 ₥ @ $2.50 per ₥ = | $14,282.50 | |
| Professional Offices | | |
| 5,445 ₥ @ $1.00 per ₥ = | $5,445.00 | |
| Multiple Family Residence | | |
| .267 Acres @ $13,500 per Acre | $3,604.50 | |
| Prescriptive Easement | $ 1.00 | |
| Parcel 1A — Wolter's — Underlying Fee | $ 1.00 | |
| TOTAL VALUE OF THE TAKING | | $ 23,334.00 |
| Value of the Remainder Before the Taking | | $214,668.00 |
| Value of the Remainder After the Taking | | |
| Service Station Site | $70,000.00 | |
| Professional Office | | |
| 67,500 ₥ @ $1.00 per acre = | $67,500.00 | |
| Multiple Family Residential | | |
| 6.763 Acres @ $13,500 per Acre | $91,300.50 | |
| Total | | $228,800.50 |
| Severance Damage | | — 0 — |
| Special Benefits | | $ 14,132.50 |

## PARCEL 2
### MARKET DATA APPROACH

Parcel 2

| | | |
|---|---|---|
| Gross Area | 10.00 Acres or 435,660 ft² |
| Prescriptive Easement 14' x 660' = | .21 Acres or 9,240 ft² |
| NET AREA | 9.79 Acres or 426,360 ft² |

Multiple Family Residential Area

| | | |
|---|---|---|
| 9.79 Acres @ $13,500 per Acre = | $132,165.00 | |
| Plus Prescriptive Easement | 1.00 | |
| Total Value of Property | | $132,166.00 |

### BEFORE AND AFTER APPRAISAL

Parcel 2

| | | |
|---|---|---|
| Value of Whole Before The Taking | | $132,166.00 |
| Value of the Taking | | |
| .393 Acres @ $13,500 per Acre = | $ 5,305.50 | |
| Prescriptive Easement | 1.00 | |
| TOTAL TAKING | | $ 5,306.50 |
| Value of Remainder Before the Taking | | $126,859.50 |
| Value of Remainder After the Taking | | $126,859.50 |
| Severance Damage | | — 0 — |
| Special Benefits | | — 0 — |

*Item 3*

MARKED FOR IDENTIFICATION
Case No. 13664
Exhibit No. 20
Filed NOV 1 0 1970
J. L. BROWN, Clerk
By........................Deputy

RESOLUTION NO. 6502

A RESOLUTION OF THE COUNCIL OF THE CITY
OF FRESNO DECLARING A POLICY IN CONNEC=
TION WITH RECOMMENDATIONS OF THE PLAN=
NING COMMISSION FOR CHANGES OF ZONE

WHENEVER an application is presented to the Planning Commission for a change in zone of the property fronting on a street shown on the Master Plan of Streets and Highways or on a street subject to a plan line, and the change in zone would result in an increase in the vehicular traffic generated by the property, the Planning Commission shall recommend to the Council the dedication of right-of-way and installation of improvements necessary to make the street conform to the Master Plan or plan line, such dedication and im= provements to be at the applicant's expense.

CLERK''S CERTIFICATION

STATE OF CALIFORNIA )
COUNTY OF FRESNO ) ss.
CITY OF FRESNO )

I, D.E. ROUGHTON, City Clerk of the City of Fresno, certify that the foregoing resolution was adopted by the Council of the City of Fresno, Calif= ornia, at a regular meeting held on the ___13___ day of ___April___, 1961.

D. E. ROUGHTON
City Clerk

128

Item 4

MARKED FOR IDENTIFICATION
Case No. 36644
Exhibit No. 21
Filed NOV. 1 0 1970
J. L. BROWN, Clerk
By .......... Deputy

COUNCIL MINUTES 7-25-63

IN THE MATTER OF REAFFIRMATION OF POLICY OF )
RIGHTS-OF-WAY AND INSTALLATION OF IMPROVEMENTS )
AS A CONDITION OF ZONING (RESOLUTION NO. 6502) )

On motion of Councilman Nagel, seconded by Councilman Wills, duly carried.

IT IS RESOLVED that the Council does hereby reaffirm the policy contained in Council Resolution No. 6502 which states that whenever an application is presented to the Planning Commission for a change in zone of the property fronting on a street shown on the Master Plan of Streets and Highways or on a street subject to a plan line, and the change in zone would result in an increase in the vehicular traffic generated by the property, the Planning Commission shall recommend to the Council the dedication of right-of-way and installation of improvements necessary to make the street conform to the Master Plan or plan line, such dedication and improvements to be at the applicant's expense.

Ayes : Mandella, Nagel, Wasemiller, Wills, Selland (Roll Call).
Noes : None.
Absent : Henderson, Moore.