[Civ. No. 55439. Second Dist., Div. One. Mar. 17, 1981.]

CITY OF COMMERCE, Plaintiff and Appellant, v.
NATIONAL STARCH AND CHEMICAL CORPORATION,
Defendant and Respondent.

**4**

COUNSEL

William Camil, City Attorney, Michael B. Montgomery, Oliver, Stoever & Laskin and Ronald J. Einboden for Plaintiff and Appellant.

Willis, Butler, Scheifly, Leydorf & Grant, O'Neill & Huxtable, Richard L. Huxtable and Joseph H. Feldhaus for Defendant and Respondent.

OPINION

HANSON (Thaxton), J.—The City of Commerce (hereinafter referred to as the City) appeals: (1) a judgment awarding to defendant National

Starch and Chemical Corporation (hereinafter referred to as National Starch) just compensation for the condemnation of a 70-foot right-of-way and slope easements appurtenant for public street purposes insofar as the amount of the severance damages and (2) the court's order awarding litigation expenses to National Starch.

FACTS

The City instituted the subject action in eminent domain on February 10, 1975, seeking to acquire 19,880 square feet of land for the construction of Corvette Street and an additional 1,015 square feet for slope easements necessitated by the grade at which the street is constructed. The newly constructed street bisects or cuts through an industrial property on Saybrook Avenue owned by National Starch and operated as a plant for the purpose of manufacturing adhesives. National Starch took the position at trial that due to the character of its use and its extensive fixturization with machinery and equipment which had a substantial value in excess of salvage value only to a major manufacturer of adhesives, the whole parcel constituted a special purpose property. The court, following a trial on the merits, so found and accordingly awarded substantial severance damages based on the reduction in value of the remaining property including all improvements thereon. The City challenges on appeal that element of severance damages based upon a reduced foreseeable useful life and accelerated depreciation of the fixtures and equipment, and the court's order awarding defendant litigation expenses.

Evidence introduced at trial disclosed that prior to the construction of Corvette Street, National Starch owned and operated its plant on an irregular shaped parcel of 3.35 acres fronting on Saybrook Avenue on the east and abutting the Santa Fe Railroad right-of-way on the west with a maximum east-west dimension of 280 feet. When National Starch acquired the northerly 1.5 acres from Rohr Aircraft, it was improved with approximately 13,000 square feet of offices, a warehouse, and gasoline pumps. Extensive modifications were made immediately in the warehouse area to equip it for the manufacture of adhesives. Excavations were made through the concrete floor, special foundations were installed, and an elevated platform was constructed in which three steam-charged mixing vats, specifically designed for the manufacture of adhesives, were installed. A boiler room was added on to generate the steam required by the mixing vats. In 1963 a 2-story structure of 1,472 square feet was added, northerly of the warehouse, equipped for the

manufacture of solvent-based adhesives. National Starch also installed various mixing and storage tanks and other fixtures specially designed and built for use in the manufacture of adhesives.

In 1963 National Starch purchased the 1.83 acres of property immediately south of the existing parcel for the express purpose of providing for future expansion of warehousing facilities. There was testimony that the acquisition of expansion area, where possible, is a standard policy of National Starch at its plants throughout the nation, appears to be a standard practice of all adhesive manufacturers and is dictated by the highly competitive character of the industry and the expanding character of the market in the Los Angeles area itself. At the time the southerly portion was acquired, pre-existing pipelines and surface easements in favor of Atlantic Richfield Company essentially bisected the north and south portions of the property. One of the conditions of acquisition of the property was that Atlantic Richfield Company would relinquish to National Starch the road easements at such time as the oil fields operated by Atlantic Richfield Company were depleted and no longer in use which was anticipated to be five to ten years. When these easements for the service road were relinquished to National Starch in 1974 the company had an unimpaired contiguous land area for future expansion. The railroad siding was relocated after acquisition of the southerly parcel to run the full length of both parcels and provide trackage for future expansions of the warehouse.

In 1968 National Starch constructed on the northerly parcel another 16,700 square feet of warehouse, together with new loading docks and shipping office. It contained a low-level floor area in which four 18,000-gallon fiberglass tanks and two 8,000-gallon stainless steel tanks were installed on special foundations for the storage of polyvinyl acetate, resins, and other liquids used in the manufacture of adhesives. Each of these tanks, which are located in the southwesterly corner of the addition, is connected by a four-inch diameter pipe to the mixing vats on the charging platform in the original building. The fixturization of both the original plant and the 1968 addition were planned and supervised by a chemical engineer from National Starch's main office with the aim to facilitate further expansion of warehousing facilities when needed.

The City, however, by November 1972 initiated activity to implement plans for putting Corvette Street through from Tubeway to Saybrook across the property owned by National Starch. In September of 1973 the City requested right-of-way negotiations for the street and held dis-

cussions with representatives of National Starch concerning the precise location of Corvette Street. Street improvements were completed in 1974 and this action was filed against National Starch and others not herein involved on February 10, 1975.

After the taking of the 70-foot wide street right-of-way which bisected its industrial facility, National Starch was left with 2 separate properties. The northerly remainder parcel consisting of approximately 91,775 square feet, was left with its improvements intact including the offices, plant, warehouse, loading dock access, offstreet parking and outside storage. This area in its after condition is hemmed in by the Corvette Street expansion. On the other hand, the remaining southerly parcel is a triangular 34,271 square feet unimproved except for the spur track which is essential for the importation of critical materials by railroad so long as the National Starch plant continues to be used for the manufacture of solvents. If the southerly remainder were sold, the seller in order to keep its only railroad access unobstructed would have to reserve exclusive use to the railroad trackage.

At the opening of the trial the City filed a motion to exclude testimony, contending that an exchange of appraisal reports and the deposition of National Starch's district manager, Floyd Sill, revealed that National Starch intended to claim damages for the frustration of its own specific plan for the development of the property. This evidence the City argued was inadmissible due to the vague and indefinite nature of possible future expansion and frustration of plan which contravened the rule stated in *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384 [82 Cal.Rptr. 1].

The trial brief and opposition to the City's motion to exclude testimony prepared by National Starch alleged that it was not claiming compensation for either the frustration of its own specific plan for the future development of the property or for deprivation of the opportunity to make greater future profits. National Starch instead asserted that since the property was dedicated to a special industrial use for the manufacture of adhesives, the *Pleasant Hill* rule supported the admissibility of evidence to establish diminution of the fair market value of the remainder, including the existing improvements and fixtures, with respect to its future use by a potential purchaser. National Starch pointed out that under *Pleasant Hill* where a special use property is involved, testimony may properly be received of the specific needs of the special user in relation to the before condition of the whole property and in com-

parison to the capacity of the remainder after the taking to serve such special user needs. The trial court upon considering the arguments of counsel denied the motion to exclude evidence, but permitted the objection to be preserved.

Testimony was introduced by National Starch at trial to demonstrate the special purpose nature of the plant and fixtures. In addition, expert evidence was received to show the difficulty of either adapting the bisected property to the purposes originally anticipated by National Starch or selling it to another adhesive manufacturer. National Starch's district manager, its head chemical engineer and its real property appraiser all testified that further expansion of the warehouse facility within the northerly parcel would be very difficult, would not be economically attractive, and would not be considered feasible by a prospective purchaser.

National Starch's first witness was Floyd Sill, its district manager, who described the fixturization on the premises which was designed especially for the manufacture of adhesives. Although he could foresee that the building and some of the fixtures might be adaptable to the use of some kind of specialty formulating chemical house, he was not aware that any adhesive manufacturing operation had ever made such a transition. There were only three or four other adhesive manufacturers that would be able to utilize the plant, and these companies already had adequate facilities in the Los Angeles area. Were there no taking for the street he said there was no foreseeable need to terminate the manufacture of adhesives at this location, but the loss of the expansion capability will probably require National Starch to discontinue its operation at this plant in from three to five years. He was of the opinion that any other adhesive manufacturer capable of using the facilities of this plant would be "in the same boat National is in."

Frank A. Dinneen, chemical engineer for National Starch, testified that possibly a pharmaceutical or specialty chemical concern could adapt the fixturization to its purposes, but this would require extensive modifications because of the special purpose nature of the existing fixtures.

Various witnesses testified to the value of the specialized fixtures to another user if severed from the property and sold. Howard P. Shelton, an appraiser specializing in valuation of machinery, equipment and fixtures, testified he had inspected the fixturization. He learned from an

interview with James P. McManus, a National Starch official, that the remaining expected life of the fixtures without expansion capability would be between three and six years and he estimated the expected remaining life in the after condition, for appraisal purposes, would be five years. He reviewed the potential for use of the various fixtures of the electrical wiring by a purchaser of the premises or another industrial purchaser. He concluded that modifications to existing fixtures for a purchaser of the premises would be costly, and if the fixturization were torn out, its salvage value would be "something like a nickel on the dollar." His appraisal report disclosed that it would cost $600,085 to replace the fixturization and that the composition of the building and its fixtures were such that if such facilities were reproduced on the valuation date, February 14, 1977, more than half of the total reproduction costs would be spent on specialized fixturization. He testified that the depreciated value of the fixtures in place in the before condition was $301,350; and that the depreciated value of those same fixtures in place in the after condition, granting a five-year remaining life, was $126,515.

In addition, National Starch officers and executives testified that there was by mid-1974 an awareness on their part that the existing facilities were crowded and that expansion should be planned. Expansion plans, however, were forestalled by the general recessionary condition of the economy in the 1974-1975 period. The district manager testified that companies were hard pressed at the time to sustain earnings and National Starch therefore decided that it would be to its advantage to try to survive with the existing facility for a period until the economy made a turn and there would be more capital available for investment and expansion.

National Starch in mid-1976 began utilizing outside commercial warehouse space to accommodate the storage of materials such as cornstarch, dextrins and adhesives that were brought into the Los Angeles area from some of its other plants and stored for distribution and resale. However, the corporate officers felt that the cost of utilizing outside warehousing was greater than would be the cost of amortizing similar space on an owned site. Prior to the taking National Starch had no plans to discontinue the Saybrook Avenue plant but had contemplated expansion of the existing facility and based on growth in the Los Angeles area in the two preceding years, it anticipated major expansion needs within the three- to five-year period. Because of the taking, however, the Los Angeles plant would have to be discontinued or relocated,

probably within three to five years. The five-year plan of National Starch, prepared apparently in 1975, as of February 1977 projected an increased dollar amount of sales, alteration in product group mix, and proposed additional fixtures and equipment although the square footage of additional warehouse space was not specified.

Robert W. Beeney, real property appraiser for National Starch, testified that because the fixturization was part of the realty, the property was in his opinion a special purpose property and could not sell for the highest price to anyone who wished to make any other use of the property. He valued the remainder in the before condition at $1,014,430 and in the after condition to be $768,310. He testified that there were very few people of National Starch's level in the industry in Southern California and they would all have the same problems with the property. His estimate of severance damages was $245,820 and he said that since the damage was foreseeable for accounting and appraisal purposes it should be accounted for today.

The City presented the testimony of two real estate appraisers: John Cozby, employed by the County of Los Angeles, and Lawrence Brown, an independent appraiser. Cozby valued the land only attributing no value to buildings or fixtures and arrived at estimated severance damages of $22,875. Brown testified that the highest and best use of the property was for a wide range of industrial uses, including that made by National Starch, and he did not appraise the specific fixtures utilized in place by National Starch. He said the configuration of the southerly parcel after the taking made it difficult to develop and estimated severance damages at $25,150. He said his investigation revealed that the City would permit use of one parcel as parking for buildings across the street upon the application and demonstration of practicality and need, since he knew the City had done this in two other instances. This use was presumed to be limited, otherwise, by the City's zoning ordinance which required that offstreet parking be contiguous to the building it served. The use proposed by Brown was placed in doubt by evidence that the City's zoning ordinance pertaining to parking contained no provision for administrative modification.

The trial court on the basis of the evidence found, inter alia, that the larger parcel owned by National Starch was bisected into two separately merchantable parcels by the City's taking; that the northerly remainder was and is improved with a factory and warehouse building designed, equipped and fixturized for the manufacturing of adhesives

including tanks, plumbing systems, platforms and mixing vats, and other special purpose structures affixed to the real property; that the southerly remainder contained no improvements other than the extension of a railroad spur track running to the northerly remainder; that the various machinery, equipment and fixtures are all part of the real property constituting the larger parcel from which the road was taken; that the depreciated contributory value for use in place of the machinery, equipment and fixtures in the before condition as part of the whole larger parcel was in excess of $295,000, a sum substantially in excess of salvage value; that such machinery and fixtures would have a value substantially in excess of salvage value only to a major manufacturer of adhesives and all of such manufacturers already have established manufacturing facilities in the area and that by reason of the foregoing the larger parcel owned by National Starch constitutes a special purpose property; that as a direct result of the taking the usefulness of the southerly remainder is substantially impaired and the foreseeable remaining useful life in place of the machinery, equipment and fixtures which are part of the northerly remainder is reduced to not more than six years; that by reason of all such factors the fair market value of the remainders, as well as their value for the continued use of National Starch, is reduced and impaired; that the value of the parcel taken for street purposes is $54,670 and that the value of the appurtenant easements is $30; and that by reason of the severance the northerly and southerly remainders of the larger parcel including all improvements thereon pertaining to the realty would be damaged and the market value thereof reduced in the sum of $187,003.25. In conclusion the court ordered acquisition of the street improvement parcels by the City for its public use requiring that National Starch receive just compensation for the taking as well as damage to the remainder in the sum of $241,703.25 plus interest from the date of taking. From this judgment and the court's subsequent minute order of February 17, 1978, granting the motion of National Starch for litigation expenses the City has appealed.

## ISSUES

The City contends (1) that the trial court erred in admitting evidence as to the accelerated depreciation of fixtures and equipment and in incorporating this as an element of damages; (2) that the trial court's findings as to the foreseeable useful life of the fixtures and equipment and the amount of severance damages are not supported by substantial

evidence; and (3) that the trial court abused its discretion in awarding litigation expenses to National Starch.

DISCUSSION

I

The City first contends that the award of severance damages for accelerated depreciation of fixtures was based upon matters, e.g., the alleged needs for expansion of the National Starch plant, which were too uncertain, remote and speculative. In essence the City reiterates its pretrial argument that evidence as to accelerated depreciation of fixtures was inadmissible on the issue of severance damages because it was based on mere future plans for expansion of the adhesives plant by National Starch.

The City correctly cites the established rule that "To recover severance damages under section 1248, subdivision 2, of the Code of Civil Procedure, the loss in market value claimed must directly and proximately flow from the taking. Damage which is speculative, remote, imaginary, contingent, or merely possible, or damage caused by competition, or recovery in advance for torts or other injuries that may or may not be committed cannot serve as a legal basis for recovery. [Citations.]" (*Arnerich* v. *Almaden Vineyards Corp.* (1942) 52 Cal.App.2d 265, 272 [126 P.2d 121].) Subsumed under this rule are the authorities excluding evidence of allegedly lost business profits (*S. & C. R. R. Co.* v. *Galgiani* (1874) 49 Cal. 139, 140) or damages to the conduct of a business on the part severed (*Oakland* v. *Pacific Coast Lumber etc. Co.* (1915) 171 Cal. 392 [153 P. 705]). The City argues that the land owner is not entitled to be placed in a better position financially than he was before the taking or to receive a windfall at the expense of the governmental entity doing the taking. (*City of Fresno* v. *Cloud* (1972) 26 Cal.App.3d 113, 123 [102 Cal.Rptr. 874].)

The City does not dispute, however, the finding of the trial court that, because of the fixturization, the use of the property by National Starch for an adhesives manufacturing facility renders it a special use property. One of the criteria for such a finding is the determination, made by the trial court on the basis of the evidence in the present case, that the fixtures used in place by National Starch have a substantial value in excess of salvage value only to a major manufacturer of adhesives. Extensive evidence was introduced on this topic which included

descriptions of the specialized design of the plant and features of the fixtures, which was heretofore summarized. In addition, there was testimony that replacement of the warehouse on the date of value would cost $500,000 while it would cost nearly $600,000 to duplicate the specialized fixtures.

■ It is well established that the value of fixtures is to be taken into consideration in determining severance damages. "'Fixtures upon the property taken must be valued ·and paid for as part of the real estate, and any depreciation in the value of fixtures upon the part not taken is to be taken into consideration, the same as damage to the soil itself.' (2 Lewis on Eminent Domain, 3d ed., p. 1276, sec. 728.)" (*City of Los Angeles* v. *Klinker* (1933) 219 Cal. 198, 205 [25 P.2d 826, 90 A.L.R. 148]; see also *City of Los Angeles* v. *Sabatasso* (1970) 3 Cal.App.3d 973, 981 [83 Cal.Rptr. 898].)

Fixtures have exceptional significance where, as in the case at bench, the real property qualifies as a special use property. (See, e.g., *City of Pleasant Hill* v. *First Baptist Church, supra*, 1 Cal.App.3d 384.) In the instance of special use property it is difficult to obtain data for appraisal purposes through sales or rentals of comparable properties. As we have pointed out, Beeney, a qualified appraiser, testified that he could obtain no sales or rental data on properties of similar size, character and use, and that the three or four companies who might be potential buyers for the National Starch property would also be adversely affected by the lack of facilities for expansion which would result in accelerated obsolescence of the fixturization. Both Beeney and Shelton as a consequence took into account the accelerated depreciation of the fixtures in calculating the market value of the property in the after condition. The City's experts failed to take this element into account in any way.

■ Under the circumstances, the trial court committed no abuse of discretion in admitting evidence of accelerated depreciation for the purpose of determining severance damages to the remainder parcel since the original parcel constituted a special use property. Where there is no data available from which to determine the actual demand or fair market value of a parcel of real property because there are no sales of similar property for reference and because of the peculiar use made by the owner of the property, there is in essence no market for the property in its current state. (See, e.g., *San Diego Land etc. Co.* v. *Neale* (1888)

78 Cal. 63 [20 P. 372].) Similarly, in the case at bench National Starch by the taking lost whatever potential buyers might possibly have been found for its adhesives manufacturing plant. The court in the *San Diego Land* case held that in such an instance "[t]he value must be arrived at from the opinions of well-informed persons based upon the purposes for which the property is suitable. This is not taking the 'value in use' to the owner as contradistinguished from the market value. What is done is merely to take into consideration the purposes for which the property is suitable, as a means of ascertaining . . . the market value. . . ." (*Id.*, at pp. 68-69.)

Expert witnesses for National Starch presented evidence based on the market value of the property for the sole purpose for which it could reasonably be used. The City argues that the claim of a shorter life for the fixtures, because it was based on the plans of National Starch for expansion, was speculative at best. However, where a special use property is involved, the opinions of experts and the data upon which such opinions are based are entitled to greater deference for lack of any other objective standard such as the price which might be obtained were a buyer readily ascertainable. (See, e.g., *People* ex rel. *Dept. Pub. Wks.* v. *Volunteers of America* (1971) 21 Cal.App.3d 111, 120 [98 Cal.Rptr. 423, 51 A.L.R.3d 844].)

The real property appraisers testifying for respondent in estimating severance damages calculated the value of the special use property to an adhesive manufacturer, the sole prospective purchaser to whom the fixtures would have any substantial value over salvage value. Because this was the only buyer likely to find the property, including the fixtures which constituted such a substantial portion of its value, useful, the reduced life expectancy of the fixtures was taken into account by these experts. This constituted an appropriate consideration under the peculiar circumstances of this case. ■ "[S]uch factors as the size and shape of the remainder, . . . and impairment of use of the property by showing the uses to which the property was adaptable prior to the taking and the limited uses to which the property may be devoted thereafter may properly be considered in determining severance damage. [Citations.] . . ." (*San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889, 902 [63 Cal.Rptr. 640].)

The determination as to the admissibility of evidence as to the expansion plans of National Starch and the accelerated depreciation of the

fixtures and equipment by virtue of the taking, in the initial instance, lay within the trial court's discretion. Having denied the motion to exclude, the trial court as trier of fact was entitled to determine the weight to be given the testimony.

On the issue of admissibility of the evidence of reduction in value of a special use property in its after condition the most informative authority is *City of Pleasant Hill* v. *First Baptist Church, supra,* 1 Cal.App.3d 384. In that case the city condemned for a roadway a portion of a parcel of real property belonging to the church and utilized for the meeting of the congregation and related church purposes. The church contended that the value of the remainder property had been substantially reduced because its plans for expansion were thwarted by the taking. Furthermore, because of the character of the improvements and the special use of the property by the church, the property had no readily ascertainable market value and the value of improvements was about equal to the cost of demolition. The value was significantly reduced by the taking because the few potential buyers would have the same problems in respect to expansion needs by virtue of population growth that were experienced by First Baptist Church.

The appellate court in ruling evidence relevant to the decreased usability of the remainder for church purposes concluded that "if the property had lost its utility for general church purposes, the church involved not only suffered specific direct damage, but was indirectly damaged with respect to any market value of the property because of the loss of whatever potential buyers might possibly have been found for the special church use. 'Such factors as the size and shape of the remainder, loss of highway frontage [here gain of highway frontage without appreciable gain in accessibility, and with loss of privacy and seclusion], and impairment of the use of the property by showing the uses to which the property was adaptable prior to the taking and the limited uses to which the property may be devoted thereafter may properly be considered in determining severance damage. [Citations.]' (*San Bernardino County Flood Control Dist.* v. *Sweet, supra,* 255 Cal.App. 2d 889, 902. See also *People* ex rel. *Dept. Public Works* v. *Lipari* (1963) 213 Cal.App.2d 485, 491-493 [ . . . ]; *West Virginia Pulp & Paper Co.* v. *United States, supra,* 200 F.2d 100, 104; *Producers' Wood Preserving Co.* v. *Commissioners of Sewerage* (1928) 227 Ky. 159, 167-168 [ . . . ]; and *Board of Education* v. *Kanawha & M. R. Co.* (1897) 44 W.Va. 71, 73-75 [ . . . ].)"

[The court further observed:] "Reflection indicates that if the special user is to be protected where the whole of the property is taken (see fn. 1, above), it is entitled to similar protection where the taking renders the property unusable for the purposes of that special user. If a school serving 200 pupils were left without a playground because the property was taken for a higher public use, the proposition that it had lost its utility for school purposes would not immediately be answered by showing that half the school buildings could be torn down so as to furnish adequate facilities for 100 pupils. (Cf. *Board of Education* v. *Kanawha & M. R. Co., supra*, 44 W.Va. 71, 73-75 [ . . . ].) Testimony was properly received of the specific needs and programs of the church involved in relation to the whole property originally held, and to the residue remaining after the taking. (See *West Virginia Pulp & Paper Co.* v. *United States, supra*, 200 F.2d at p. 103; and *Producers' Wood Preserving Co.* v. *Commissioners of Sewerage, supra*, 227 Ky. 159, 167-168 [ . . . ].)" (*City of Pleasant Hill* v. *First Baptist Church, supra*, 1 Cal.App.3d 384, 404-405.)

██ The admissibility of all relevant evidence as to valuation is generally supported by Evidence Code section 813 which requires only that proof of the value of the property be supplied by qualified witnesses. "Indeed, the section itself expressly contemplates the admission of *any* relevant evidence ' . . . for the limited purpose of enabling the [trier of fact] to understand and weigh' the opinions of the valuation witnesses." (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Wherity* (1969) 275 Cal. App.2d 241, 249 [79 Cal.Rptr. 591], original italics.)

*Pleasant Hill* was a jury trial and instructions were required to aid the jury in discriminating the purposes for which evidence of the future expansion plans of the church would be inadmissible (e.g., mere frustration of future plans of the owner) from those as to which the evidence was clearly material (e.g., the reduction in value of the remainder in the hands of the owner). The appellate court ruled that the evidence was admissible for the latter purpose leaving the weight of the evidence to be determined by the jury as the trier of fact. It is a fortiori admissible where, as in the case at bench, trial is by the court.

## II

██ The City further contends that the trial court's findings that the "foreseeable remaining useful life in place of the machinery, equipment and fixtures which are part of the northerly remainder is reduced

to not more than 6 years" and that the fair market value of the remainders, including all improvements thereon pertaining to the realty were damaged and the market value thereof reduced in the sum of $187,003.25 are not supported by substantial evidence.

This argument is refuted by the admissible evidence which we have heretofore summarized. The real property appraiser for National Starch testified that he took into consideration the economic feasibility of continued use of the facilities only to the extent that it affected the present market value of the real property, which included the machinery, equipment and fixtures constituting a part thereof. This evidence of substantial impairment of use which diminished the market value of the property is admissible since, although loss of profits is not compensable in eminent domain, compensation for diminution in value of the remainder for its prior highest and best use is constitutionally compelled. (See, e.g., *Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc.* (1978) 77 Cal.App.3d 742 [143 Cal.Rptr. 803]; *People* ex rel. *Dept. Public Works v. Giumarra Vineyards Corp.* (1966) 245 Cal.App.2d 309 [53 Cal.Rptr. 902].)

The unrefuted evidence in the case at bench provided by witnesses Sill, Shelton and Beeney was that the fixturization had an estimated remaining economic life of not over six years. The evidence introduced by National Starch consisted of qualified expert opinion which was not, as the City argues, based upon matters remote, speculative, or conjectural. The City, although apprised in advance that National Starch would introduce such evidence at trial, introduced no expert evidence either as to the value of the machinery and equipment in before or after condition or as to the character and special needs of the adhesive industry.

■ The power of this court on review begins and ends with the determination of whether there is any substantial evidence to support the trial court's findings. (*Estate of Teed* (1952) 112 Cal.App.2d 638, 643-644 [247 P.2d 54].) "Substantial evidence is relevant evidence of ponderable legal significance which is reasonable in nature, credible, and of solid value. [Citation.] The testimony of a single witness (even a party himself), whether he be an expert or a layman may be sufficient to satisfy the substantial evidence test. [Citations.]" (*Jarchow v. Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 948 [122 Cal.Rptr. 470].) ■ There is ample evidence to support the findings of the trial court that the remaining life of the machinery and fixtures was

reduced to six years and to support its use of the calculations of severance damages based on this determination in making the award.

### III

 The City finally contends that the award of litigation expenses to National Starch constituted an abuse of discretion. Since the litigation commenced prior to July 1, 1976, the procedure was controlled by Code of Civil Procedure section 1249.3 (the substance of which is now incorporated with modifications in Code Civ. Proc., § 1250.410). That statute requires a final offer by the plaintiff-condemner and demand by the defendant-owner which form the basis for a subsequent determination by the trial court as to whether the offer was reasonable. If the offer is found to be unreasonable and the demand reasonable, the court is required to award to the owner costs, including litigation expenses, necessary to protect the defendant's interest throughout the proceedings.

The parties in the case at bench stipulated at the first pretrial conference that the statutory requirements would be satisfied by including the final offer and demand in the mandatory settlement conference order. Accordingly, at that conference on January 26, 1977, the parties exchanged appraisal reports and made the final offer and demand. The City's offer was $78,950, the amount of the higher of its appraisals. The final demand of National Starch was $145,000 (approximately $96,000 below the award ultimately made by the court). The appraisals and the offer of the City upon which they were based completely failed to take into account the claim by National Starch that the market value of the remainder was substantially reduced by the impairment to the useful life of the fixtures. In the period of over five months prior to trial which commenced July 15, 1977, the City apparently made no further effort to confront this issue or to counter the appraisals presented by National Starch.

Following entry of the interlocutory judgment on November 15, 1977, National Starch filed its memorandum of costs and disbursements including notice of motion to recover litigation expenses. The court by minute order awarded National Starch costs in the amount of $42,486.49.

The City in essence claims that the court's determination that National Starch was entitled to litigation expenses (Code Civ. Proc.,

§ 1249.3) was based on a finding that the City's offer was unreasonable which is unsupported by the record. ■ The implied finding of reasonableness or unreasonableness is a factual determination which lies within the purview of the trial court and where supported by any substantial evidence, this determination will not be disturbed on appeal. (*City of Los Angeles* v. *Cannon* (1976) 57 Cal.App.3d 559, 562 [127 Cal.Rptr. 709].) The general guidelines followed by courts in determining whether an award of litigation costs is required take into consideration (1) the amount of the difference between the offer and the compensation ultimately awarded; (2) the percentage of the difference between offer and award; and (3) the good faith, care and accuracy, and how the amount of offer and demand, respectively, were derived. (*State of California* ex rel. *State Pub. Works Bd.* v. *Turner* (1979) 90 Cal.App.3d 33, 37 [153 Cal.Rptr. 156]; *City of Los Angeles* v. *Cannon, supra,* 57 Cal.App.3d 559.) The City argues that it held a good faith belief that the reduced value of the fixtures was not compensable and that if the amount attributed to accelerated depreciation is removed from consideration, the difference between appraisers as to the fair market value of the remainder is not great.

■ The fact remains that the difference between offer and eventual judgment was great, that the City made no effort to show good faith by obtaining an appraisal which would take into consideration the reduced value of the fixtures, and that the City maintained this unyielding position throughout the litigation. In a similar situation, this court has found a city lacking in reasonableness. (*City of Gardena* v. *Camp* (1977) 70 Cal.App.3d 252 [138 Cal.Rptr. 656].) The court in *Camp* made the following pertinent observation: "The City was oblivious to the opinion of defendants' expert appraiser that significant severance damages would attend condemnation of the property...." (*Id.,* at p. 257.) Although the court acknowledged that the subject of severance damages was one as to which reasonable men might differ, the court concluded that a reasonable person would have included it as a factor in negotiations.

In view of the fact that the City consistently both prior to and during trial failed to acknowledge the possibility that the reduced value of the fixtures might be included in calculating the severance damages, its failure to enter further negotiations to compromise prior to trial and its failure to obtain expert evidence relative to valuation of the fixtures, the court's implied determination that its conduct was unreasonable is supported by the record. The award of litigation expenses was proper.

## Disposition

We affirm the judgment and the order awarding litigation expenses. Respondent to receive costs and attorneys' fees on appeal.

Spencer, P. J., and Lillie, J., concurred.