[No. D039112. Fourth Dist., Div. One. June 10, 2003.]

CITY OF CARLSBAD, Plaintiff and Appellant, v.
JOSEPH A. RUDVALIS as Cotrustee, etc., et al., Defendants and
Respondents.

668

## COUNSEL

Ronald Ball, City Attorney; Matteoni, Saxe & O'Laughlin, Norman E. Matteoni, Peggy M. O'Laughlin; Asaro, Keagy, Freeland & McKinley, Roscoe D. Keagy and Richard R. Freeland for Plaintiff and Appellant.

McDonough, Holland & Allen and Richard G. Rypinski for the cities and towns of Alameda, Bakersfield, Burlingame, Cerritos, Chino, Chula Vista, Coachella, Corte Madera, Cotati, Del Mar, Escondido, Fremont, Hollister, Huntington Beach, Kerman, Laguna Beach, Lakewood, Livermore, Lodi, Los Altos, Monterey, Monterey Park, Novato, Oceanside, Oxnard, Palm Desert, Palm Springs, Placentia, Redding, Redlands, Rialto, Ross, Sacramento, San Anselmo, San Buenaventura, San Diego, San Dimas, San Francisco, San Jose, San Luis Obispo, San Ramon, Santa Clara, Santa Paula, Santa Rosa, Signal Hill, Sonoma, Sunnyvale, Tiburon, Tracy, Vacaville and Vista as Amici Curiae on behalf of Plaintiff and Appellant.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Gary C. Weisberg, Michael H. Leifer and Ronald M. Cole for Defendants and Respondents.

## OPINION

**O'ROURKE, J.**—In consolidated eminent domain actions brought by the City of Carlsbad (the City), the City appeals from a portion of a judgment in favor of defendants Joseph A. Rudvalis and Barbara G. Rudvalis (collectively Rudvalis) as trustees of the Joseph and Barbara Rudvalis Family Trust UDT 6/7/89 and Pamela Koide. Both Rudvalis and Koide own commercial nurseries. Among other damages, the jury awarded defendants severance damages consisting of diminution in value of nursery improvements and personal property on the theory the City's project, a road extension, accelerated residential development, thereby shortening the economic life of the nurseries and rendering their nursery assets valueless. The City also appeals a postjudgment order awarding defendants their litigation expenses and costs. The City's main contention is that defendants are not entitled to damages for diminution in value to tangible business assets suffered as a consequence of accelerated urbanization not directly or proximately caused by the road project or the taking in and of itself. We agree and therefore reverse the judgment with directions that the superior court enter a new judgment omitting those damage awards.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Properties*

Rudvalis and Koide own and operate separate commercial wholesale nursery businesses on adjoining lots within the City. Rudvalis as trustee of the Joseph and Barbara Rudvalis Family Trust UDT 6/7/89 is the fee owner of the land on which the Rudvalis nursery is located (the Rudvalis property); the Rudvalis nursery hybridizes and cultivates orchids. Koide, doing business as Bird Rock Tropicals, is a tenant under month-to-month tenancies whose nursery is located on a portion of land owned by William and Donna Baker (the Baker property), and also on an adjacent parcel owned by an entity referred to as Bolton. Koide hybridizes and cultivates bromeliads and orchids.

*The Eminent Domain Proceeding*

In June 1998, the City brought eminent domain proceedings to acquire portions of the Rudvalis and Baker properties for purposes of extending Poinsettia Lane and acquiring a 102-foot-wide right-of-way. The complaints incorporate the City's resolution of necessity (Code Civ. Proc., §§ 1240.240, 1245.220)[1] describing its project as the City's proposal "to construct the extension of Poinsettia Lane from Aviara Parkway to Black Rail Road and Brigantine Drive from Poinsettia Lane north to the Oceanbluff [*sic*] development." The City sought to take .05 acres of the northwest corner of the Rudvalis property for slope and temporary construction easements. It sought to take approximately 3.07 acres of the Baker property for right-of-way and for slope, drainage and temporary construction easements. None of the buildings, fixtures or equipment of either nursery is situated on the condemned property and the land was not damaged as a result of the construction and operation of the project.

At the time the City filed its complaint, the Rudvalis and Baker properties were zoned limited control (LC) by the City, although the City's general plan had designated the property for residential use since 1965. The circulation element of the general plan showed Poinsettia Lane in 1965. The LC designation permits agricultural uses on the property, but the present nursery uses are nonconforming because the agricultural structures exceed certain minimum requirements within the LC zone. While the nurseries therefore cannot be modified or expanded, nothing in the City's planning or land use requirements prevents the continued use or operation of the businesses as they exist.

---

[1]All statutory references are to the code of Civil Procedure unless otherwise indicated.

*The Bench Trial*

The cases were consolidated and proceeded first to a bench trial before superior court Judge John Einhorn to resolve whether defendants could claim economic damages consisting of diminution in value to their tangible business assets—their improvements, fixtures, equipment and inventory—due to the "accelerat[ed] transition of the subject properties and the surrounding lands to incompatible residential development" stemming from the road extension. The City opposed the damage claims on numerous grounds including (1) they were speculative or conjectural; (2) defendants had waived any claim for loss of business goodwill, of which any diminution in value to tangible business assets was a part; (3) severance damages were limited to those caused by the taking or construction and use of the project; and (4) defendants could not recover diminution in value of movable equipment and inventory since marketplace factors—not the City's act of condemnation or the road extension project—caused any alleged need to relocate or inability to relocate their businesses.

After considering the parties' briefing, testimony and offers of proof, Judge Einhorn issued a written ruling permitting defendants to present their compensation claims to the jury. ■■■■■ The judge in the compensation trial, Judge David Moon, ultimately interpreted this ruling as one permitting the issue of defendants' entitlement to these damages to be decided by the jury.[2]

*The Compensation Jury Trial*

At the compensation trial, in addition to physical damages to inventory,[3] defendants sought economic damages on the theory that their nursery assets and improvements suffered a shortened economic life due to "massive development pressures" to more rapidly convert the property to residential

---

[2]In an eminent domain action, the court decides all questions of law and fact with the exception of the issue of the *amount* of compensation, which goes to the jury. (*People v. Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799]; *Emeryville Redevelopment Agency v. Elementis Pigments, Inc.* (2002) 101 Cal.App.4th 1083, 1116 [125 Cal.Rptr.2d 12] (*Elementis*).) However, on the City's request for clarification following the bench trial, Judge Einhorn stated his ruling on the issue of economic damages was not intended to resolve the issue of the City's liability for damages. In interpreting this ruling Judge Moon said: "By [my] ruling, I'm ironically doing no more than what Judge Einhorn has done, and I am ruling, simply, that the issue of entitlement and the issue of valuation will both go to the jury in one fell swoop. I don't intend to bifurcate any portion or part of entitlement, liability, damages or some combination thereof, one from the other."

[3]On appeal, defendants do not challenge the jury's awards of noneconomic, i.e., physical, damages. At the close of the evidence defense counsel confirmed physical damages were limited to plant inventory, that is, actual plants and blooms. The parties settled the damages for the land taken before trial.

use—all caused by the road extension. Both defendants sought damages for diminution in value of not only greenhouses, shade structures, and other improvements unique to their nursery businesses, but also items such as telephone systems and paper towel dispensers, office equipment and furniture, appliances, office supplies including pencils and paper clips, portable hand and power tools, clocks, stereo equipment, and vehicles.

Defendants' expert real estate appraiser, William Hansen, testified that the Rudvalis property's highest and best use as of June 1998 before the taking (the "before condition") was ultimate residential use, with interim use for nursery operations for a period of eight to 10 years. He testified the Baker property's highest and best use in the before condition as of June 1998 was ultimate residential use with interim nursery use for a period of six to eight years. Thus, according to Hansen, recognizing the transitional LC zoning, a buyer in the before condition would look to continuing the nursery uses for those periods of time. Hansen testified that after the taking (the "after condition"), the demand for residential development would be immediate, and the highest and best use of both properties was residential. He concluded that in the after condition, the nursery assets and improvements would be valueless or reduced to liquidation value: "I felt that the continuation of the [nursery] use would be in the order of zero to two years. But in terms of a value to a prospective purchaser, I believe it would be—there would be no value to a prospective purchaser." On cross-examination, Hansen conceded urbanization—or converging growth and development in and around the properties—created the improvements' obsolescence, and the urbanization impacted the highest and best use of the property. According to Hansen, "[t]he difference between the remaining physical life of the improvements and the remaining economic life of the improvements is a result of this urbanization issue . . . and that is a contributing factor to the accelerated depreciation."

Defendants also presented business appraisal expert Donna Desmond, who testified the tangible assets and inventory of the Koide and Rudvalis nurseries were marketable in place for respectively eight and 10 years of continued agricultural use in the before condition. According to Desmond, the economic pressure from the project shortened that interim agricultural use to a period from zero to two years, thus affecting how long the businesses could continue to economically and physically operate on the properties. Rudvalis's expert, Jeffrey Donahue, testified he agreed with Hansen's conclusion there was shortened expected life of Rudvalis's nursery improvements in the after condition of the property. For example, he testified the road project accelerated the economic obsolescence of the greenhouses so that in the after

condition they were worth only 10 percent of their value.[4] As for movable equipment and items such as chairs, file cabinets and tools, Donahue testified they would suffer economic loss if the business closed, which, in his opinion, it would have to do under the circumstances.

At the close of the defendants' evidence, the City moved for nonsuit on various elements of defendants' economic damage claims.[5] In part, it argued (1) as to defendants' movable personal property including inventory, such damage was not compensable because it was not caused by the condemnatory act in and of itself; and (2) any economic losses were not otherwise compensable because they were caused by an exercise of the City's police power or urbanization and not the roadway project. The City further asserted the losses were actually goodwill damages arising from loss of its business location, a claim that defendants had waived. The court denied the motion, finding sufficient evidence the defendants suffered economic loss caused by the condemnatory act. Later, the court stated its ruling was in fact a determination that the defendants were entitled to such damages and could present those claims to the jury for determination of their amount.

In its case-in-chief, the City's assistant planning director, Gary Wayne, testified to the City's land use planning as well as the progression of the various developments surrounding the subject properties, including the Ocean Bluff subdivision. He explained the City's general plan had designated the property for residential use since 1965. In the 1990's, property owners began to submit tentative maps for development of their properties. The planning process for the Ocean Bluff subdivision began in the mid-1990's. At that time, growth management and local facilities management plans were already in place requiring property owners to construct public facilities and to provide services as conditions for development. Development in the area was allowed to proceed further when the bridge and thoroughfare district for Poinsettia Lane was adopted to finance road construction in the event smaller property owners could not afford the cost of putting in the road. According to Wayne, the developer—not the City— would typically build roads like Poinsettia Lane because the development created the need for the road. He agreed, however, the road access and the

---

[4]He explained: "That's based upon basically a buyer of this business coming in would look at these greenhouses and say why would I pay for these greenhouses when it's obvious this area has to be developed almost instantly. So it's my opinion that that buyer would only pay 10 percent value instead of 100 percent value or 75 percent value. A common sense [sic] buyer and . . . a willing and knowledgeable buyer is not gonna pay full price for something that's gonna have to be torn down. So I then removed 90 percent of the value."

[5]The City's motion was not a nonsuit in the usual sense since, read literally, Code of Civil Procedure section 581c indicates a nonsuit is only appropriate against a plaintiff. (E.g., *City of Santa Cruz v. MacGregor* (1960) 178 Cal.App.2d 45, 49-50 [2 Cal.Rptr. 727].)

Ocean Bluff subdivision would not have occurred without the City's use of eminent domain.

*The Verdict*

By special verdict, the jury awarded damages as follows: To Rudvalis, it awarded $118,324 for "non-economic (physical) damages to unaffixed, movable personal property caused by [the City's] taking and/or construction and use of the Pointsettia extension project"; $745,036 for "economic damages to unaffixed, movable personal property caused by [the City's] taking"; and $640,431 in "economic damages to improvements pertaining to realty severance damages to improvements caused by [the City's] taking and/or construction and use of the Poinsettia extension project." To Koide, it awarded $153,710 for the physical damages to unaffixed, movable personal property caused by the City's taking or construction; $759,566 in economic damages to unaffixed, movable personal property caused by the taking; and $195,009 in economic damages to improvements pertaining to realty caused by the taking and/or construction. The jury was specifically instructed not to include any amounts awarded for noneconomic physical damages within the economic damage award for the unaffixed movable personal property. The court entered judgment in defendants' favor.

The City moved for a new trial, judgment notwithstanding the verdict (JNOV), and to vacate the judgment. It did not challenge the portion of the judgment awarding defendants compensation for noneconomic physical damages to their tangible business assets. The City's motions challenged the economic damage awards to both defendants' improvements to realty and movable personal property as against law on previously raised grounds. As to Koide, the City further argued she was not entitled to economic damages to either improvements pertaining to realty or movable personal property located on the Bolton property, nor was she entitled to severance damages for those items because no unity of title existed between that property and the Baker property. The court denied the motions and entered a new judgment on the consolidated actions.

Defendants sought and the court awarded litigation expenses in the amount of $346,397.31 for Rudvalis, and $264,627.82 for Koide. The City appeals from the judgment, as well as the postjudgment orders awarding litigation expenses and denying JNOV, denying the motion to vacate the judgment and denying the City's motion to tax costs.

DISCUSSION

## I. *Eminent Domain Principles*

### A. *Just Compensation*

■ "An owner is entitled to just compensation for property taken for public use. (Cal. Const., art. I, § 19; U.S. Const., 5th Amend.; Code Civ. Proc., § 1263.010.)" (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 925 [62 Cal.Rptr.2d 121], fn. omitted.) The principle behind the concept of just compensation is to put the owner in as good a position pecuniarily as he would have occupied if his property had not been taken. (*Ibid.*; *City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1027-1028 [130 Cal.Rptr.2d 108].) But it is the duty of the state to see that compensation is just not merely to the individual whose property is taken, but to the public that is to pay for it. (*Bauman v. Ross* (1897) 167 U.S. 548, 574 [17 S.Ct. 966, 976, 42 L.Ed. 270].) "The just compensation required by the constitution to be made to the [property] owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." (*Ibid.*; *Los Angeles Metropolitan Transportation Authority v. Continential Development Corp.* (1997) 16 Cal.4th 694, 716 [66 Cal.Rptr.2d 630, 941 P.2d 809] (*Continental*) [compensation for taking or damage to property must be just to the public as well as to the landowner]; *Saratoga Fire Protection Dist. v. Hackett* (2002) 97 Cal.App.4th 895, 902 [118 Cal.Rptr.2d 696].)

The measure of just compensation is the fair market value of the property. (*San Diego Metropolitan Transit Development Bd. v. Cushman, supra,* 53 Cal.App.4th at p. 925.) Under the Eminent Domain Law (§ 1230.010 et seq.), "[t]he fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing and able to buy but under no particular necessity for doing so, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).)

### B. *Severance Damages*

■ When property acquired by eminent domain is part of a larger parcel, in addition to compensation for the property actually taken, the property

owner must be compensated for the injury or damage, if any, to the land that he retains, reduced by the amount of benefit to the remainder. (§ 1263.410; *City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 744 [25 Cal.Rptr.2d 480, 863 P.2d 725].) Once an owner is found entitled to these so-called severance damages, they are measured by comparing the fair market value of the remainder before and after the taking. (*City of San Diego v. Neumann, supra,* at p. 744; *San Diego Metropolitan Transit Development Bd. v. Cushman, supra,* 53 Cal.App.4th at p. 926.) Section 1263.420 defines severance damages as "the damage, if any, caused to the remainder by either or both of the following: [¶] (a) The severance of the remainder from the part taken; [¶] (b) The construction and use of the project for which the property is taken in the manner proposed by the plaintiff, whether or not the damage is caused by a portion of the project located on the part taken." Severance damages "shall be based on the project as proposed." (§ 1263.450.)

With respect to improvements located on remainder property, courts have long held that any depreciation in the value of fixtures upon the remainder is to be taken into consideration " 'the same as damage to the soil itself.' " (*City of Los Angeles v. Sabatasso* (1970) 3 Cal.App.3d 973, 981 [83 Cal.Rptr. 898], quoting *City of Los Angeles v. Klinker* (1933) 219 Cal.198, 205 [25 P.2d 826, 90 A.L.R. 148].) However, "[n]ot every diminution in value that flows from a partial taking results in severance damages. 'Merely rendering private property less desirable for certain purposes, or even causing personal annoyance or discomfort in its use, will not constitute the damage contemplated by the [C]onstitution.' " (*San Diego Metropolitan Transit Board v. Cushman, supra,* 53 Cal.App.4th at p. 926, fn. 2, quoting *Eachus v. Los Angeles etc. Ry. Co.* (1894) 103 Cal. 614, 617 [37 P. 750].) " ' "To recover severance damages . . . , the loss in market value claimed must directly and proximately flow from the taking. Damage which is speculative, remote, imaginary, contingent, or merely possible . . . cannot serve as a legal basis for recovery." ' " (*City of Hollister v. McCullough* (1994) 26 Cal.App.4th 289, 296 [31 Cal.Rptr.2d 415], citing *City of Commerce v. National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 13 [173 Cal.Rptr. 176] (*National Starch*); *County of Santa Clara v. Curtner* (1966) 245 Cal.App.2d 730, 746 [54 Cal.Rptr. 257].)

II. *Defendants Are Not Entitled to an Award of Severance Damages for Diminution in Value of Business Assets Caused by Accelerated Residential Development*

The City contends the awards for economic damages to defendants' business assets—both improvements and movable personal property—cannot be sustained because (1) such damages are the proximate result of the

surrounding area's urbanization—not the road extension project; (2) the awards were based on mere speculation and conjecture, not substantial evidence; and (3) compensation for diminution in value of defendant's movable personal property is not constitutionally permitted and those items do not fall within the definition of improvements pertaining to realty under section 1263.205, subdivision (a). The City further contends defendants failed to prove their nursery improvements had compensable interim use under *Elementis, supra,* 101 Cal.App.4th 1083, a case decided after the City filed its opening brief in this appeal.

Amici curiae that have appeared in this case likewise maintain the road extension project was not the legal cause of any transition from agricultural to residential use. They argue impacts caused by the *timing* of the extension of public infrastructure to land specified for residential use in a local general plan are not compensable, primarily because the City's decision to extend such infrastructure in accordance with a general plan is a legislative act (Gov. Code, § 65301.5) made in the exercise of the City's police power.

We need not reach the police power issue, nor do we decide whether there is sufficient evidence of a compensable interim use because, as discussed below, we conclude as a matter of law that the economic damages defendants sought were neither caused by the construction or use of the project nor the result of the condemnatory act in and of itself, and thus the losses are not compensable.

## A. Severance Damages Must Be Caused by Construction and Use of the Project

The trial court, in what ultimately became its finding on the threshold issue of entitlement to compensation,[6] found defendants had presented sufficient evidence they suffered economic loss to their tangible business assets, defining such losses as "diminution in value from the before condition to the after condition caused by the condemnatory act, the taking." The City

---

[6]As indicated, although the trial court initially ruled the jury would decide the threshold issue of entitlement to economic damages, it later advised the parties it had decided that issue in ruling on the City's nonsuit motion. Because it decided the matter under nonsuit standards, however, the court did not weigh the evidence or consider the witnesses' credibility as it would have had it decided the matter in a bifurcated bench trial. (See *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948]; *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 444 [105 Cal.Rptr.2d 856] [trial court may not weigh the evidence or consider the credibility of witnesses on a motion for nonsuit but must accept as true the evidence most favorable to the nonmoving party and disregard any conflicting evidence].) Procedural irregularities notwithstanding, we consider the question of causation in this case one of law, not of fact. (See *Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1084 [274 Cal.Rptr. 342].)

contends this ruling was error because it necessarily turned on noncompensable effects of urbanization rather than construction and use of the project. We agree.

Our focus is on the causation element in eminent domain actions. "It is the damages [to the remainder] *caused by* the *taking* which is the subject of a condemnation action. That is what the governing statute says. It provides that the condemnee may recover any 'damage . . . *caused to* the remainder *by* . . . (a) [t]he severance [or *by*] . . . (b) [t]he construction and use of the project for which the property is *taken* in the manner proposed by the plaintiff . . . .' " (*Placer County Water Agency v. Hofman* (1985) 165 Cal.App.3d 890, 896 [211 Cal.Rptr. 894]; § 1263.420, subd. (b).) ▪ Although the Eminent Domain Law defines severance damages in terms of the construction and use of the project, as opposed to the taking of the defendants' real property itself, it nevertheless does not abolish the requirement of direct and proximate cause. "Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law . . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." (*Weissich v. County of Marin, supra,* 224 Cal.App.3d at p. 1084.)

▪ Here, it is undisputed that the project is the extension of roadways toward residential development already in progress. Deputy City Engineer David Hauser testified: "The project is essentially the construction of two segments of roadway. One was the extension of Poinsettia Lane from Aviara Parkway up curving, make a little 'S' curve and tying into what is known as [Black Rail Road]. The other piece of roadway that was constructed as part of the project is Brigantine Drive, and that extends from Poinsettia Lane up north, curvingly and going into this development here . . . being known as Ocean Bluff Development." Even under defendants' theory, the claimed shortened life expectancy and depreciation of nursery business assets and improvements are caused *not* by the construction and use of extended Poinsettia Lane and Brigantine Drive, but by the residential development on surrounding properties claimed to have been "accelerated" by that use. For example, Koide testified: "It is my determination that the life of the business has been severely shortened as a result of the project because of the increased activity in terms of sales of properties, residential development that has been approved and moved into the area, that the project spurred all this development." Desmond pointed out that in the after condition, there was a great deal of pressure on the two property owners to rapidly develop their property in the face of encroaching development. She cited the "uneasy standoff between residential uses and nursery uses" as a basis for her opinion that it would be economically infeasible for the businesses to continue their

operations in the after condition. But, as the City persuasively puts it, "[g]rowth inducement is simply not part of the design, construction, and operation of the public project, which is the basis for compensable severance damages."

In arriving at our conclusion, we reject defendants' interpretation and application of *Continental, supra,* 16 Cal.4th 694, and *National Starch, supra,* 118 Cal.App.3d 1. Defendants maintain severance damages may be based on *any factor* causing a diminution in fair market value of the property and thus the jury can properly award damages for obsolescence of the improvements caused by the accelerated transition of the surrounding lands to residential use. (*Continental,* at p. 712; *National Starch,* at p. 14.) But *Continental* does not abrogate the requirement that severance damages directly and proximately flow from the project's construction and use. There, the California Supreme Court said "[s]everance damages are not limited to special and direct damages, but can be based on any factor, *resulting from the project,* that causes a decline in the fair market value of the property."[7] (*Continental,* at p. 712, italics added.) *Continental* affirms the rule that damages must be based on conditions "caused by" or "resulting from" the project that are substantiated by competent, nonspeculative and nonconjectural evidence. (*Continental,* at pp. 712, 718.) The Supreme Court favorably cited *McCoy v. Union Elevated R.R. Co.* (1918) 247 U.S. 354 [38 S.Ct. 504, 62 L.Ed. 1156] for the principle that a property owner would not be deprived of a fundamental right when a state permits consideration of " 'actual benefits—enhancement in market value—*flowing directly from a public work,* although all in the neighborhood receive like advantages. In such case the owner really loses nothing which he had before; and it may be said, with reason, there has been no real injury.' " (*Continental,* at p. 715, italics added.)

Relying on *National Starch, supra,* 118 Cal.App.3d 1, defendants point out that the improvements and fixtures here are special purpose items that cannot be sold to a knowledgeable buyer who would want to operate the respective nurseries because, as was the case in *National Starch,* it is not feasible to continue the uses at the subject property location. The admittedly special purpose nature of the greenhouses, shadehouses and other unique structures[8] is of no consequence to the determination of severance damages here because defendants do not reach the threshold consideration that damages for loss in market value directly and proximately flow from the

---

[7]In articulating this rule in their brief, defendants eliminate the causation element, incorrectly stating that under *Continental, supra,* 16 Cal.4th at page 712, "severance damages can be based on 'any factor' causing a diminution in fair market value of the property."

[8]The City's fixtures and equipment appraiser, Gordon Hjelmstrom, agreed the nurseries' greenhouses and certain improvements servicing those structures were special purpose items.

project's construction and use. (E.g., *City of Hollister v. McCullough, supra,* 26 Cal.App.4th at p. 296; *Arnerich v. Almaden Vineyards Corporation* (1942) 52 Cal.App.2d 265, 272 [126 P.2d 121] (*Arnerich*).)

*National Starch* is inapposite in any event. In that case, the City of Commerce condemned a portion of property to construct a street that bisected the defendant's property, which had been extensively modified with permanent improvements for its adhesive manufacturing plant. (*National Starch, supra,* 118 Cal.App.3d at pp. 6-7.) The project left the defendant with two smaller remainder parcels; one left with improvements intact, the other unimproved except for a track used for importation of materials specific to adhesive manufacturing. (*Id.* at p. 8.) Trial testimony revealed the defendant had a standard nationwide policy to expand its facilities and the taking made its anticipated expansion very difficult and economically unfeasible to a prospective purchaser. (*Id.* at pp. 7, 9.) The defendant's district manager testified the loss of expansion capability would require the defendant to discontinue its operation in three to five years. (*Id.* at p. 9.) Under those specific circumstances, the Court of Appeal held the trial court did not abuse its discretion in admitting evidence of the accelerated depreciation of the special use fixtures. (*Id.* at p. 14.)

Here, the construction and use of the Poinsettia and Brigantine extensions did not directly impact defendants' planned uses as did the road in *National Starch,* which bisected and decreased the size of the defendant's parcel, effectively hemming in its use. To the contrary, defendants' damage claims rest on developmental influences arising well before construction of the road extensions.[9]

*Arnerich,* on which the City relies, is compelling. There, the plaintiff, who operated a public utility company, brought an action in eminent

---

[9]Koide nevertheless maintains the road created a physical barrier through the Baker property (on which her nursery lies), making expansion impossible and rendering her improvements nearly valueless to any third party buyer. The flaw with this argument is that Koide's damage theory is premised on continued presence at the respective business location for six to eight years absent the Poinsettia extension. But Koide, as a month-to-month tenant, had no right to such continued operation of her business on either the Baker or Bolton properties. According to Donahue, Koide and Baker were merely in the process of negotiating a lease when they first heard of the project. These circumstances are analogous to those in *San Diego Metropolitan Transit Development Board v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517 [86 Cal.Rptr.2d 473] (*Handlery*), in which the defendant hotel sought compensation for business goodwill and precondemnation damages after its lease expired and while it was negotiating a new lease. (*Id.* at pp. 526-527.) This court rejected the defendant's argument the precondemnation conduct deprived it of the opportunity to enter a hypothetical long-term lease to continue operating its golf course business: "A hypothetical future lease resting on the 'probability of renewal,' unlike a contractual option to renew an existing lease, is not a compensable property right [citation], because its potential execution rests upon the commercial vagaries of the market, its players and their competitive interests. . . . A mere expectation, or even probability, that the lease will be renewed based upon past practice and present

domain to obtain an underground right-of-way easement for existing pipe-lines across a corner of the defendant's land, the remainder of which was used for growing grapes and alfalfa. (*Arnerich, supra,* 52 Cal.App.2d at pp. 266-267.) For irrigation, the defendant diverted water from a creek flowing along the boundary of its lands. The plaintiff did not divert directly from the creek, but pumped the water from wells on her property and piped it to customers mainly to the north of her land. (*Id.* at p. 267.) The defendant sought severance damages in part on the theory that it was damaged because the creek water would be diminished by plaintiff pumping from her wells; that the competition for water between it and the plaintiff would diminish its profits; and that the condemned land was so strategically located that a pipe line through it constituted the only feasible means by which water could be conveyed to customers to the north. (*Id.* at p. 268.) The defendant's experts testified to such diminution in value; all admitted, however, that the con-demned easement in no way physically affected the main parcel. (*Id.* at pp. 268-269.)

The trial court struck that testimony and the appellate court affirmed the resulting judgment on the ground the loss in value did not directly and proximately flow from the taking. (*Arnerich, supra,* 52 Cal.App.2d at pp. 270-272.) The Court of Appeal said: "The plaintiff was not seeking to condemn any water rights of defendant. If plaintiff has water rights superior to those of defendant she has the legal right to use those rights and to sell the water and to transport it to her customers. If the defendant's water right is prior and superior to that of plaintiff it may restrain plaintiff from improp-erly using the water, or compel her to condemn the water right. This action involves only a right of way for the purpose of laying pipes across two hundred eleven feet of defendant's property. That is only a small portion of plaintiff's pipeline. The fact that that two hundred eleven feet of pipe is an integral part of plaintiff's water system, and that through the water pipes may flow water which may or may not belong to defendant, is a false issue in this proceeding. Defendant may not convert this action to condemn a ten-foot strip two hundred eleven feet long across the corner of its property

good relations between landlord and tenant, is not a legal right of renewal." (*Id.* at p. 531.) We concluded the defendant's hypothetical lease resting on a speculative expectation of renewal, as well as its personal property interest, was not compensable. (*Id.* at pp. 532-533 ["Without an option to renew, [the defendant] had no legally protectible property interest in the continued operation of the course after the 50-year lease term expired naturally"].) We are not persuaded by Koide's attempt to distinguish *Handlery* on the ground she has a compensable interest in the real estate since she owns improvements pertaining to the realty. The distinc-tion is not persuasive where Koide's damage claim is premised on her expectation of several years of continued operations on the Baker and Bolton properties. When a severance damage claim rests on continued operation on a particular parcel of real property, there must be some showing of a compensable right in that property. Koide did not have such an enforceable interest. The City cannot be made to compensate her for a mere expectancy.

for the purpose of placing water pipes therein, into an action wherein it may secure damages for injury to its water rights caused, not by the pipe line where it crosses defendant's property, but by pumping on the plaintiff's property." (*Id.* at p. 271.) The court continued: "In this proceeding plaintiff cannot be compelled to pay for something she not only does not desire to condemn, but would not receive by the judgment. The damage, if any, to defendant's lands, is caused by the pumping operations of plaintiff. That damage would be exactly the same in amount if, instead of condemning this strip, plaintiff had elected to condemn a strip on the adjoining . . . property. To repeat, according to defendant's witnesses, the only damage is the damage or threat of damage to defendant's water rights, caused not by the pipe line, but by the pumping operations, actual or threatened on plaintiff's property." (*Id.* at pp. 271-272.)

Even if we were to assume the subject project attracted residential development to the area, such urbanization would occur and the defendants' asserted damages would be exactly the same if the road extension passed through adjoining property not owned by the defendants. In fact, much of the incoming development was not dependent on the Poinsettia extension. The City's Assistant Planning Director Wayne confirmed that several developments in the area did not require the construction of Poinsettia Lane.

Defendants argue *Arnerich* is inapposite on several grounds. First, they maintain the case was decided before the 1975 revision of California's Eminent Domain Law, and citing section 1263.420, subdivision (b), they assert the law now permits severance damages to be predicated on "project-related activities" not located on the part taken. We disagree with this broad characterization of the statute. As stated, that subdivision defines damage to the remainder as damaged caused by "[t]he construction and use *of the project for which the property is taken* . . . whether or not the damage is caused by a portion of the project located on the part taken." (§ 1263.420, subd. (b), italics added.) Simply stated, use of extended Poinsettia Lane consists of travel upon it and attendant traffic, fumes and noise. There was no evidence such use impacted either nurseries' tangible business assets; indeed, both Rudvalis and Koide conceded the operation of the road, including resulting dirt and dust, did not damage any of their fixtures and equipment. Use of the road does not prevent either Rudvalis or Koide from continuing their operations, and it does not result in such an invasion or injury that required either to relocate their nursery operations. Both Rudvalis and Koide continued to operate the nurseries and were doing so at the time of trial, at least three years after the project's completion.

Defendants also contend the damages sought in *Arnerich* resulted from activities entirely unrelated to the maintenance and use of the plaintiff's

pipeline; there was no physical change to the *Arnerich* defendant's property because the pipelines were already underground; and the court focused on the property rights taken as opposed to the construction and use of the plaintiff's project. Although we concede *Arnerich* was not decided under the present statutory scheme, in our view consideration of the project's use would not alter that court's conclusion, which was premised on the fact the plaintiff was not condemning or taking the plaintiff's water rights, only a portion of her land for an easement.

 Were we to adopt the position taken by defendants on causation, we would in any event reject the damage awards on the ground the negative effect of accelerated surrounding development on the subject properties caused by the extended roadway is an injury that is *damnum absque injuria,* that is, damage without injury. (*Customer Company v. City of Sacramento* (1995) 10 Cal.4th 368, 381, fn. 6 [41 Cal.Rptr.2d 658, 895 P.2d 900].) Under that doctrine, "a person may suffer damages and be without remedy because no legal right or right established by law and possessed by him has been invaded, or the person causing the damage owes no duty known to the law to refrain from doing the act causing the damage." (*Rose v. State* (1942) 19 Cal.2d 713, 729 [123 P.2d 505].) Just as diversion of traffic from a business is not a compensable injury inasmuch as a landowner has no property right in the continuation or maintenance of the flow of traffic past his property (see *id.* at p. 737), these defendants have no legal right or vested interest in keeping the surrounding land free of incoming development or increased population. In *People v. Ayon* (1960) 54 Cal.2d 217, 223 [5 Cal.Rptr. 151, 352 P.2d 519], the court addressing a property owner's right of ingress and egress said: "[A property owner] cannot demand that the adjacent street be left in its original condition for all time to insure his ability to continue to enter and leave his property in the same manner as that to which he has become accustomed. Modern transportation requirements necessitate continual improvements of streets and relocation of traffic. The property owner has no constitutional right to compensation simply because the streets upon which his property abuts are improved so as to affect the traffic flow on such streets. If loss of business or of value of the property results, that is noncompensable. *It is simply a risk the property owner assumes when he lives in modern society under modern traffic conditions.*" (*Id.* at pp. 223-224, italics added.) Thus, even assuming surrounding development had an influence on the value of the properties' improvements or fixtures, the Constitution does not contemplate its indemnification. Put another way, the law does not equate just compensation with total indemnification. (See *Community Redevelopment Agency v. Abrams* (1975) 15 Cal.3d 813, 827 [126 Cal.Rptr. 473, 543 P.2d 905, 81 A.L.R.3d 174].) We agree the court erred in considering accelerated urbanization as a factor to be used in

assessing fair market value. (See Evid. Code, § 822 [noncompensable items of value, damage or injury are inadmissible as evidence and are not a proper basis for an opinion as to the value of property].)

B. *Movable Personal Property*

Although our conclusions above apply to Rudvalis's and Koide's economic damage awards for both improvements pertaining to the realty and personal property, we alternatively strike the awards for economic damages to unaffixed, movable personal property on the independent ground such damages were not caused by the condemnatory act in and of itself.[10]

In general, personal (i.e., removable) property is not compensable. (*Chhour v. Community Redevelopment Agency* (1996) 46 Cal.App.4th 273, 282-283 [53 Cal.Rptr.2d 585]; see *Community Redevelopment Agency v. Abrams, supra,* 15 Cal.3d at pp. 834, 835; *County of San Diego v. Cabrillo Lanes, Inc.* (1992) 10 Cal.App.4th 576, 583 [12 Cal.Rptr.2d 613] (*Cabrillo Lanes*).) "Movable items of personal property are not 'taken' by the public entity when it condemns real property or a business; instead, under the Relocation Assistance Act (Gov. Code, § 7260 et seq.), the public entity compensates the owner for the cost of moving the personal property to a new site." (*Cabrillo Lanes, supra,* at p. 583.)

It is only where personal property is "damaged or destroyed *by the physical appropriation of a portion of the owner's property*" that such damage is compensable in eminent domain. (*Baldwin Park Redevelopment Agency v. Irving* (1984) 156 Cal.App.3d 428, 435-436 [202 Cal.Rptr. 792] (*Baldwin Park*), italics added.) In *Baldwin Park*, the redevelopment agency sought to take the *entirety* of the defendant's property, consisting of two parcels of approximately 6.2 acres in size on which the defendant operated her junk-yard business. (*Id.* at p. 433.) Forced to relocate because she would no longer

---

[10]We distinguish the condemnatory act from the project, which is the extension of Poinsettia Lane to the Ocean Bluff development. Because there can be no dispute that the condemnatory act is the City's taking of the specified portions of the subject properties (see *Community Redevelopment Agency v. Abrams, supra,* 15 Cal.3d at p. 834 [focusing on the "act of condemning the property upon which defendant conducted his business" to determine whether that act did or did not in and of itself result in the loss of value of which the defendant complained]), the question of defendants' entitlement to compensation for depreciation of their movable personal property becomes one of law. Defendants characterize the City's challenge as one to the court's admission of evidence on this issue, thus implicating an abuse of discretion standard. As we understand it, however, the City challenges the trial court's threshold decision that such damages were compensable ("the trial court committed reversible error in allowing defendants to present to the jury their claims for economic damages for their moveable personal property"). Even if we were to consider this a question of whether the court properly permitted defendants' experts to present evidence on this issue, we would conclude it abused its discretion by doing so.

have use of the property but discovering she could not find a suitably zoned site for her business, the defendant sought to prove the loss in value of her business inventory (several hundred vehicles in various stages of disrepair). (*Id.* at p. 434.) The trial court excluded evidence of those damages; the Court of Appeal held the ruling was error. Because the "condemnatory act in and of itself," i.e., the taking of defendant's entire parcel, resulted in the devaluation of the defendant's stock in trade, she was entitled to such compensation. (*Id.* at pp. 434, 439.) The court explained: "[I]f personal property which is located on the real property can simply be picked up and moved without loss to the property owner then the condemning Agency takes and pays for only the land and fixtures. In the latter situation the condemner has not taken or damaged the personal property. But that is not the same as saying that such personal property is never compensable when it has been taken or damaged as a result of condemning the underlying real property. [Citation.] [¶] Where the removal or relocation of either tangible or intangible personal property, under the circumstances of the particular case, is made *impossible* by the condemnatory act itself, then the owner's just compensation should not be limited by an arbitrary notion that in eminent domain any particular form of recognized property right is noncompensable. [Citation.] [¶] 'This is so because . . . the constitutional concept of just compensation expresses a principle of fairness.'" (*Id.* at p. 436, italics added.)

■■■ The principles of fairness expressed in *Baldwin Park* do not arise here. These defendants were not uprooted as was the defendant in *Baldwin Park.* There is no evidence either defendant was *forced* to relocate as a result of the City's *condemnatory act in and of itself,* that is, the taking of portions of the subject properties for placement of Poinsettia Lane. The road did not encroach upon any of the buildings, improvements or tangible assets; the condemnatory act did not render relocation "impossible." (*Baldwin Park, supra,* 156 Cal.App.3d at p. 436.) The defendants' unaffixed personal property did not lose value due to the "physical appropriation of a portion of" the real property on which the nurseries lie. (*Ibid.*) To the contrary, the evidence indicates it was only the defendants' decision to succumb to the pressure of surrounding residential development, including neighborhood complaints, that would force relocation. (Accord, *Community Redevelopment Agency v. Abrams, supra,* 15 Cal.3d at p. 834 [pharmacist denied compensation for certain drugs where his age and physical condition—not the condemnatory act in and of itself—prevented their transfer to a new location].) Such circumstances do not justify departure from the general rule disallowing compensation for unaffixed personal property. (*Ibid.*)

Defendants argue there was evidence of actual physical taking of income-producing plant inventory and that the physical damage contributed to the

economic losses to the nursery property, somehow compelling a conclusion in this case that diminution in value of defendants' movable personal property is compensable under *Baldwin Park*. They point to Desmond's testimony that a buyer looking at the risk of the nursery business in the after condition would be influenced by the physical damage that had occurred to the plant inventory; Koide's testimony that a buyer looking at the business in the after condition would see that certain damaged plants would not generate income for many years; and Donohue's testimony that the Rudvalis nursery would not be able to continue to produce cut flowers due to the dirt and dust. There are several flaws in this argument. First, we find no support in *Baldwin Park* for this proposition. Further, the parties segregated physical damages to the plant inventory from economic damages to other tangible business assets, and the jury separately compensated defendants for those physical damages under specific instructions from the court not to include those damages within the economic damage awards. Finally, we agree with the City that lost future income assertedly suffered due to fact the business can no longer produce high-quality cut flowers falls into the category of goodwill damages under section 1263.510,[11] a claim defendants withdrew before trial.

Nor are defendants entitled to compensation for their unaffixed personal property on the theory, expressed by expert Donahue, that the property could not be removed from the nursery premises without a substantial economic loss, thus falling within the definition of improvements pertaining to the realty. (§ 1263.205.) We rejected such a contention in *Cabrillo Lanes, supra,* 10 Cal.App.4th 576. The defendant there operated a bowling alley on property that was to be condemned for a trolley station. It prepared an inventory of personal property ranging from the bowling lanes and equipment to air conditioning equipment to cups and saucers and desks. (*Id.* at p. 582.) Pointing to the Legislative Committee comment to section 1263.205 ("[e]quipment includes . . . furniture of a motel or restaurant where such furniture cannot be removed without substantial economic loss"), the defendant argued all the items were on the premises because of the bowling alley's operation; that they were integral to the bowling alley; and therefore they were improvements pertaining to the realty. (*Cabrillo Lanes,* at p. 583.)

We disagreed with the defendant's broad reading of the comment: "[R]estaurant and motel furniture may be built in, and so specific to one location that substantial economic loss occurs in its removal. In other words, some furniture in restaurants and motels may not truly be 'movable' to another

---

[11]Section 1263.510 defines goodwill as "the benefits that accrue to a business as a result of its location, reputation for dependability, skill or quality, and any other circumstances resulting in probable retention of old or acquisition of new patronage."

location; such furniture is an improvement pertaining to realty. . . . [¶] . . . The cited examples of furniture in the Legislative Committee Comment, in our opinion, shows only a Legislative recognition that certain site-specific types of furniture found in businesses like restaurants and motels may be included within the definition of 'improvements pertaining to realty'; not a legislative determination that all furniture and movable items are 'improvements pertaining to realty.' " (*Cabrillo Lanes, supra,* 10 Cal.App.4th at pp. 583-584.) We then confirmed that under *Baldwin Park,* "the [government agency] is required to compensate a condemnee for economic losses relating to movable personal property only when the condemnatory act in and of itself . . . causes the failure of relocation." (*Cabrillo Lanes,* at p. 585.) Our application of *Baldwin Park* resolves the question; the jury's award for economic loss to defendants' movable personal property cannot be sustained because there is no evidence the City's condemnatory act in and of itself destroyed the value of defendants' unaffixed business assets.

### III. *Litigation Expenses*

The City contends the court erred in awarding defendants their litigation expenses since the present dispute involves unique issues and the City acted in good faith in making its final offer to the defendants. We remand the matter for a redetermination of litigation expenses.

Litigation expenses may be awarded to the defendant in a condemnation proceeding if the court finds that "the [final] offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded. . . ." (Code Civ. Proc., § 1250.410, subd. (b).) "Several factors have emerged as general guidelines for determining the reasonableness or unreasonableness of offers. They are ' "(1) the amount of the difference between the offer and the compensation awarded, (2) the percentage of the difference between the offer and award . . . and (3) the good faith, care, and accuracy in how the amount of offer and the amount of demand, respectively, were determined." ' " (*Continental, supra,* 16 Cal.4th at p. 720.) We review such an award for abuse of discretion. (*Id.* at pp. 719-721.)

Our conclusion that we must strike the economic damage awards for depreciation of defendants' improvements and personal property leaves Rudvalis and Koide with noneconomic damage awards of $118,324 and $153,710, respectively. Under these circumstances, we cannot consider the question by simply looking to the newly adjusted mathematical relation between the offer and rewards (*Continental, supra,* 16 Cal.4th at p. 720); we must remand the question of litigation expenses for reconsideration in light

of the respective parties' offers and demands and remaining factors listed above.

## DISPOSITION

The judgment is reversed and the matter remanded with directions that the superior court enter a new judgment omitting Rudvalis's awards of $745,036 for economic damages to unaffixed, movable personal property and $640,431 for economic damages to improvements pertaining to realty; and omitting Koide's awards of $759,566 for economic damages to unaffixed, movable personal property and $195,009 for economic damages to improvements pertaining to realty; and awarding Rudvalis and Koide noneconomic damages in the amounts of $118,324 and $153,710, respectively. The superior court is directed to reconsider the award of litigation expenses. The City of Carlsbad shall recover its costs on appeal.

Huffman, Acting P. J., and Nares, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 1, 2003.